UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

VIRGINIA D. THOMAS,
PLAINTIFF

VS.

COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

CASE NO. 1:06CV00519
(WEBER, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed her application for Disability Insurance Benefits in September, 2002. Her application was denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) at Tampa, Florida in July, 2005. Plaintiff was represented by counsel at the hearing, at which she testified, as did Vocational Expert (VE), Tennyson Wright. The ALJ reached an unfavorable decision in January, 2006, from which Plaintiff processed an appeal to the Appeals Council, which denied review in June, 2006. Plaintiff filed her Complaint with this Court in August, 2006 and seeks judicial review of the Social Security Administration final decision.

## STATEMENTS OF ERROR

Plaintiff argues that the ALJ made two errors prejudicial to her case: (1) The ALJ erred when he found Claimant's mental impairments, depression and anxiety, not severe, and (2) the ALJ further erred in failing to consider the combined effects of all impairments.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was 54 years of age as of the date of the hearing, completed high school and a couple of courses at a junior college. She said she was 5'4" tall and weighed approximately 160 lbs, right-handed, separated from her husband and had no dependant children. Plaintiff testified that she lived in Plant City with her son and daughter-in-law and was a licensed driver. She indicated that she drove for short distances daily. She also indicated that she last worked was in 1998 as a probationary employee with SunCoast Federal Credit Union as a teller, but was terminated for excessive absences after she went to Michigan to care for her husband's dying mother. She testified that she has a glass of wine every four months or so, but smokes one pack of cigarettes per day.

When asked by her attorney why she claims she is unable to work, Plaintiff stated that she can neither sit nor stand for long periods of time, which she defined as 30 minutes for sitting and 15-20 minutes for standing. Plaintiff testified that she was unable to resume the type of work she previously performed as a teller because of carpel tunnel syndrome in her left arm and nerve damage in her right arm. Plaintiff attributes both disorders to an automobile accident, a rear end collision, in November, 2001, an event which occurred after she was terminated from the credit union. Plaintiff also testified that had the accident not occurred, she still would not have been able to return to her past relevant work because of back pain. She then admitted that she probably could return to her past relevant work, but it would require her to lay down for several hours upon returning home after completion of the workday.

After the automobile accident, Plaintiff was engaged in a course of physical therapy when she suffered a heart attack and had bypass surgery in March, 2002. Plaintiff said that she experiences back and leg pain when she squats or kneels. Dr. Arocho, Plaintiff's primary care physician, imposed a 5 lb. lifting restriction. Plaintiff also has had several post-surgical trips to the emergency room for chest pain when she was ultimately admitted to the hospital, given Nitroglycerine and put on a heart monitor. She presently suffers from stress-related chest pain at the rate of once per week, for which she takes Xanax and reclines.

Plaintiff testified that she spends most of the day in a recliner or on the couch and watching television. She takes short walks, does some low-impact exercises and sleeps with

splints for her carpel tunnel problems. (Tr. 489-515).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's first hypothetical asked the VE to assume that Plaintiff could lift 10 lbs. frequently and 20 lbs. occasionally and that she would be able to sit, stand and walk for 6 hours in a workday with occasional postural limitations. The first hypothetical also included a restriction from jobs requiring exposure to temperature extremes or any high aerobic activity. The VE responded that Plaintiff could perform her past relevant work as a automobile salesperson or a claims collector.

The second hypothetical asked the VE to assume all the requirements of the first, but to add a sit/stand option. The VE responded that Plaintiff could still perform her past relevant work.

The third hypothetical, which the ALJ ultimately accepted, asked the VE to assume that Plaintiff could lift up to 10 lbs., sit for 6 hours in a workday and stand/walk for 2 hours in a workday and that Plaintiff would have a sit/stand option. The VE opined that Plaintiff could perform a representative number of sedentary semi-skilled jobs, such as credit card clerk, check cashier and credit reporting clerk.

The Fourth hypothetical asked the VE to assume that Plaintiff could perform only sedentary work, but would require unscheduled rest periods of 15 minutes duration at the rate of 1 or 2 per day. The VE then testified that Plaintiff would be unemployable with those restrictions.

## THE ADMINISTRATIVE LAW JUDGE'S OPINION

The ALJ found that Plaintiff had a number of severe impairments: (1) chest pain and coronary artery disease status post bypass surgery, (2) arthritis, (3) osteoporosis, (4) left cubital tunnel and left carpel tunnel syndrome. The ALJ found that no impairment nor combination of impairments met any listing. The ALJ found that Plaintiff had the residual functional capacity to lift 10 lbs. occasionally, sit for 6 hours in a workday, stand/walk for 2 hours in a workday if

granted a sit/stand option.

**MEDICAL RECORD**

In December, 1998, John Fox, M.D., a primary care physician, saw Plaintiff for chest congestion, noted that Plaintiff "continues to smoke at least a pack per day," diagnosed her with "acute bronchitis" and prescribed bed rest and Sparfloxacin. (Tr. 116). In July, 1998, Plaintiff saw Dr. Fox for low back pain, at which time it was noted that a recent MRI showed "degenerative lumbar joint disease, but with no disc herniation." Ultram was prescribed. (Tr. 117). In June, 1998, Dr. Fox reported that Plaintiff had taken several months off for "extreme anxiety." He prescribed Zanax for anxiety. (Tr. 118). In May, 1998, Dr. Fox noted that Plaintiff "smokes 2 packs per day" and "strongly encouraged smoking cessation." (Tr. 119). In April, 1998, Dr. Fox diagnosed Plaintiff with "severe anxiety, situational depression, severe osteoporosis, low back syndrome and persistent upper respiratory infection with tobacco abuse." He felt that "most of her problems stem from anxiety and depression," but Plaintiff was unwilling to seek psychiatric treatment. (Tr. 120). In March, 1998, Dr. Fox recommended whirlpool baths and NSAIDS for back pain. (Tr. 122). In January, 1998, Dr. Fox recommended Fosamax for osteoporosis, diet and exercise for obesity (5'6" and 182 lbs. as shown by other documentation) and Zyban for tobacco abuse. (Tr. 123-126).

In July, 1998, a MRI of the lumbar spine was done by Bharat Patel, M.D. in Tampa, Florida. The test showed "no evidence of lumbar disc herniation or stenosis." (Tr. 132). A treadmill exercise test was administered by Hal Applebaum, M.D., in Tampa. The results indicated "no evidence of myocardial ischemia." Dr. Applebaum commented that "it is unlikely that she has underlying severe multi- vessel coronary disease." (Tr. 137).

In January, 2002, physical therapist John Hisamoto, reported to Pedro Arocho, M.D., that Plaintiff had completed 10 physical therapy sessions after a diagnosis of cervical strain, that she experienced a 35% improvement and that she would profit from more therapy and a home exercise program. Plaintiff sustained the injury in an automobile accident in November, 2001 in Florida. (Tr. 139-150).

Edmund Grant, M.D., a neurologist, saw Plaintiff in January, 2002. The history taken

then indicated that Plaintiff was injured in 1973 when she fell from a horse and injured her left femur. She recovered from a partial paralysis, but had severe headaches, which stopped after chiropractic treatments. The back and neck pain were aggravated by the automobile accident in 2001. Dr. Grant found no evidence of radiculopathy or myelopathy. He prescribed Effexor and provided some samples for headache relief. (Tr. 151-158).

X-rays of the cervical spine, taken in November, 2001, showed "mild osteopenia with mild diffuse degenerative changes." (Tr. 159).

In February, 2002, Dr. Arocho referred Plaintiff to Vasco Marques, M.D., a cardiologist. Dr. Marques saw Plaintiff for "fluttering in her chest" and shortness of breath with chest pain radiating down the left arm. An EEG was normal and cardiac enzymes were normal. The patient was noted to be a heavy smoker and to have high cholesterol and there were heart problems on her father's side of the family. She was admitted for a treadmill nuclear stress test, which showed "no evidence of ischemia or necrosis" and "normal left ventricular systolic function with ejection fraction of 66%." (Tr. 166-173).

Plaintiff's chest pain and fatigue persisted and in March, 2002, she was evaluated by Richard Morrison, M.D. and Dr. Vasques for a coronary artery bypass graft through a process called cardiac catheterization. After the process, Dr. Vasques concluded that Plaintiff had "coronary artery disease with ostial left main disease and mid 70% left anterior descending stenosis." The bypass procedure was performed on March 15, 2002. (Tr. 174-188). Post surgical chest x-rays showed "the heart is upper limits of normal in size" and there is "small pleural effusion at the left hemithoracic base (appearing to represent a small amount of pleural fluid)." (Tr. 208).

Plaintiff was evaluated in January, 2003 by Robin Hughes, M.D. in Tampa, Florida. Dr. Hughes complained of heart trouble, chronic back and neck pain plus anxiety and depression. Plaintiff told Dr. Hughes that she could sit for 2 hours in a workday, stand/walk for 20-30 minutes at a time and lift less than 10 lbs. Dr. Hughes found spasm in the right cervical spine and lower lumbar spine, tenderness along the cervical and lumbar spine, but negative straight leg raising and no radiculitis. Dr. Hughes diagnosed her with arthritis and osteoporosis. (Tr. 217-219).

Francis Klingle, M.D. completed a residual functional capacity assessment in February,

2003. Dr. Klingle opined that Plaintiff could occasionally lift 20 lbs. and frequently lift 10 lbs. He estimated that she could stand/walk about 6 hours in a workday and sit for about 6 hours. Dr. Klingle felt that Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl. She should avoid temperature extremes. (Tr. 221-229).

Arthur Hamlin, Psy. D., a clinical psychologist, evaluated Plaintiff in February, 2003. Dr. Hamlin diagnosed Plaintiff with depression, but found that she had only mild restriction of activities of daily living, maintaining social function and maintaining concentration, persistence and pace. Dr. Hamlin found Plaintiff's depression to be other than severe. (Tr. 229-242).

In November, 2002, Dr. Arocho reported that Plaintiff did not suffer from a mental impairment that significantly interfered with daily functioning. Dr. Arocho prescribed antidepressants, but made no referral for psychiatric treatment. In May, 2003, Dr. Arocho then opined that Plaintiff had a mental impairment that significantly interfered with daily functioning, however, he still made no referral for psychiatric treatment. (Tr. 242-243).

A follow-up examination by Mario Canedo, M.D., partner of Dr. Marques at Cardiology Center of Tampa, indicated that Plaintiff was stable. She was advised to exercise and to discontinue tobacco abuse. (Tr. 245-246). In March, 2002, Dr. Canedo reported that Plaintiff continued to have daily episodes of chest pain and had decreased her smoking from 2 packs per day to 1 pack per day. (Tr. 247-248).

Plaintiff was evaluated by Glenn Perry, Ph.D., a clinical psychologist, in July, 2003. Dr. Perry noted no deficits in the areas of understanding and memory, adaptation or concentration, persistence or pace. He did find deficits in the area of social function and indicated that Plaintiff's "blunt affect, social withdrawal and tearfulness will cause interpersonal problems." Dr. Perry diagnosed Plaintiff with major depression at a moderate level and felt that her depression was secondary to her physical problems. (Tr. 249-252).

A residual functional capacity assessment was done by J.D. Perez, M.D. in June, 2003. Dr. Perez found that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently. Dr. Perez thought that Plaintiff could stand/walk for 6 hours in a workday, sit for 6 hours in a workday. (Tr. 253-260). A similar psychiatric evaluation was done in July, 2003 by a psychiatrist, whose name we cannot read. In any event, that psychiatrist agreed that Plaintiff suffered from depression, but found only mild restrictions in Plaintiff's ability to maintain social functioning,

maintain concentration, persistence or pace and perform activities of daily living. There were no documented episodes of decompensation. (Tr. 261-274).

Plaintiff had a series of follow-up appointments at the Cardiology Center in Tampa. In July, 2003, Plaintiff reported chest pain not induced by exercise. A previous EEG in February, 2003 showed "no sustained supraventricular tachychardia." At that time, Plaintiff complained of palpitations. In November, 2002, Plaintiff reported shortness of breath, but no chest pain. Dr. Marques noted that Plaintiff continued to smoke and failed to undertake an exercise program, both of which were against medical advice. There was no evidence of ischemia. In April, 2002, 1 month after undergoing bypass surgery for "significant left main and LAD stenosis," Plaintiff reported that she experienced no cardiac symptoms. (Tr. 275-285, 421-422).

Dr. Arocho referred Plaintiff to Karla Ledoux-Cotton, D.O.. for numbness and pain "from the elbows down." Electrophysiologic studies showed "left ulnar entrapment at the elbow." (Tr. 286-290).

Plaintiff treated with Family Physicians of Tampa from December, 1999 to January, 2004 for a variety of complaints, most of which dealt with chronic cervical strain and osteoporosis, although there was periodic treatment for anxiety/depression, for which antidepressants like Zoloft were prescribed. For Plaintiff's reports of chest pain, Dr. Arocho ordered a chest x-ray and an EKG. (Tr. 290-330). A CT of the brain, done in January, 2004, after Plaintiff complained of headaches, "revealed no intracranial abnormalities." (Tr. 331).

In March, 2003, Plaintiff had a CT scan of the chest, which showed "vascular calcifications," but no mass noted and "small mediastinal lymph nodes which are nonspecific and most likely benign." (Tr. 338). In January, 2003, chest x-rays of the left lung, lordotic view, showed "no abnormal density." (Tr. 340). A chest x-ray, lateral view, in January, 2003, showed "mild nodularity in the lung apices with asymmetric increased density on the left lung apex" and "deformities of the right 5th, 6th and 7th ribs." (Tr. 341). Upon Plaintiff's complaint of left breast pain, a mammogram was done in November, 2002. The mammogram showed "no signs of malignancy." (Tr. 344). In March and April, 2002, post coronary bypass x-rays showed a normal sized heart. (Tr. 346-347).

In November, 2001, Plaintiff had an MRI of the cervical spine after complaints of headaches, pain and tingling in the neck, back and both arms. The MRI showed "some mild to

moderate neural foraminal stenosis at C4-5 and C6-7" and "some mild neural foraminal narrowing at C7-T1." (Tr. 353). A previous MRI in October, 2001 showed a "normal cervical spine." (Tr. 354). Bowel studies using a contrast material were "unremarkable" in September, 2001 as was an upper GI series (Tr. 355-356). X-rays of the lumbar spine in September, 2001 showed "mild desiccation at L3-4, L4-5 and L5-S1" and a "broad-based disc bulge at L5-S1." (Tr. 357). A CT scan of the brain was done in September 2001 and it showed "no hemorrhage, mass or lesion," but "mild atropic change." (Tr. 358).

A mammogram in January, 2000 was normal. (Tr. 369-370). Films of the kidneys in December, 1999, taken upon Plaintiff's complaint of left flank pain showed a "normal appearing upper urinary tract" with "no evidence of obstruction." (Tr. 371). Sinus films were taken upon Plaintiff's complaint of congestion, but the films showed "no acute process." (Tr. 372).

An MRI of the lumbar spine in December, 1999 showed "mild disc desiccation at L3-4, L4-5 and L5-S1. The most severely affected level is L5-S1 with a small broad-based bulge that is slightly eccentric to the right and abuts and slightly distorts the right S1 nerve root. No evidence of herniated nucleus pulposis." (Tr. 375). Plaintiff was treated in August, 2004 by Pedro Arocho, M.D. for "chronic lumbosacral strain." (Tr. 378).

Plaintiff was referred to Vasco Marques, M.D., a cardiologist, in September, 2004. Dr. Marques diagnosed her with coronary artery disease and indicated that she had coronary artery bypass graft surgery in 2002, which surgery was preceded by a heart attack. She had been noncompliant with treatment and follow-up visits. She continued to smoke and was in the process of divorce when she experienced chest pain and went to the emergency room of University Community Hospital in Tampa, Florida. Dr. Marques diagnosed her with chest pain syndrome and indicated that she had both high cholesterol and hypertension. He recommended a cardiac enzyme series, possible nuclear stress test, blood tests and an echocardiagram. (Tr. 393-395 and 414-419).

A follow-up visit to Richard Morrison, M.D., the cardiac surgeon, was for a small abscess at the end of her incision. It was treated with Cipro and Dr. Morrison indicated that her incisions were completely healed and that he gave her "much encouragement, which is mostly what she needed." (Tr. 399). In April, Dr. Morrison reported that Plaintiff had undergone coronary bypass grafting in March, 2002. Dr. Morrison reported that Plaintiff had normal blood pressure, clear

lungs, regular heartbeat, healed sternum and left radial artery harvest site. (Tr. 400).
In March, 2002, Plaintiff had a procedure known as left heart catheterization, which resulted in the recommendation that she undergo bypass graft surgery. The procedure confirmed "coronary artery disease with ostial left main disease and mid 70% left anterior descending stenosis."(Tr. 406-408). The operative report indicates that Dr. Morrison performed "coronary bypass grafting x 2 using the left internal mammary artery to the left anterior descending artery and the left radial artery to the obtuse marginal artery." (Tr. 409-412).

A nuclear scan treadmill and echocardiogram, done in September, 2004 showed "no evidence of reversible ischemia, left ventricular ejection fraction of 61-66% and normal aortic root, valve, cusp separation and flow velocity." The tests also showed "normal mitral valve, color Doppler interrogation, normal tricuspid valve, normal left ventricular chamber dimension, wall thickness and contractility, no evidence of pericardial effusion or intracardiac masses and normal left ventricular systolic function" (Tr. 427-429).

In January, 2004, Plaintiff visited the emergency room for headaches and pressure in the chest. The etiology of the chest pressure was undetermined, but heart sounds and the chest x-ray and EKG were normal. (Tr. 451-454).

Plaintiff saw Umesh Raturi, M.D., a hand surgeon, for left hand and arm pain as well as recent tendency to drop things. Dr. Raturi diagnosed her with "left cubital tunnel syndrome and left carpal tunnel syndrome." He recommended the use of an elbow pad and wrist splint at night and nerve testing, which revealed slow ulnar conduction velocity across and above the left elbow. (Tr. 466-477).

Lastly, in April, 2005, Plaintiff was seen by David Schulak, M.D. following a fall in which she suffered a "nondisplaced fracture of the right dominant proximal humerus," which was placed in a sling by doctors at Prednum Memorial Hospital in Palatka, Florida. Dr. Schulak recommended a program of home exercise and formal physical therapy if the home exercise did not result in quick improvement. (Tr. 481-482).

## OPINION

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden

of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen*, No. 87-6189, slip op. At 4 (6th Cir. Oct.28, 1988). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The Secretary's decision on this issue must be supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R.

11

§§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R §§ 404.1520a(b)(2) and 416.920a(b)(2). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. 20 C.F.R. §§ 404.1520a(c)(3)and 416.920a(c)(3); *see Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The first three areas are rated on the following five-point scale: none, mild, moderate, marked, and extreme. The fourth is rated on the following four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. §§ 404.1520a(c)(4)and 416.920a(c)(4).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

In order to receive benefits, an individual must follow the treatment prescribed by his/her physician if the treatment will restore the ability to work, unless there is an acceptable reason for the failure to follow the treatment. 20 C.F.R. § 404.1530; *see Awad v. Secretary of H.H.S.*, 734 F.2d 288 (6th Cir. 1984); *Fraley v. Secretary of H.H.S.*, 733 F.2d 437 (6th Cir. 1984). Acceptable reasons for failure to follow prescribed treatment include, but are not limited to: 1) the treatment is contrary to plaintiff's religious beliefs; 2) plaintiff is unwilling to repeat a surgery which was previously unsuccessful; and 3) the treatment involves great or unusual risk. 20

12

C.F.R. § 404.1530(c). If an impairment can reasonably be controlled, or is reasonably amenable to treatment, it cannot serve as a basis for a finding of disability. *Young v. Califano*, 633 F.2d 469, 472-73 (6th Cir. 1980); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir.), *cert. denied*, 389 U.S. 993 (1967), *reh'g denied*, 389 U.S. 1060 (1968).

Benefits may not be denied, however, if the treatment is merely recommended, suggested, or offered as an alternative, as opposed to treatment being ordered or prescribed. *Harris v. Heckler*, 756 F.2d 431, 435 n.2 (6th Cir. 1985); *Young*, 633 F.2d at 472-73. The Commissioner may not presume that impairments are remediable; the record must show that the treatment will restore plaintiff's ability to work. *Johnson v. Secretary of H.H.S.*, 794 F.2d 1106, 1111-13 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435 n.2.

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974

(6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan,* 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.,* 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan,* 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.,* 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher,* 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan,* 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of

14

disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff first assigns as error the ALJ's finding that her mental impairments were not severe. We disagree that the ALJ committed any error with respect to his evaluation of Plaintiff's mental impairment. We emphasize that it is not the diagnosis that carries the day in social security law, but the functional limitations which result from the diagnosed impairment. Dr. Hamlin evaluated Plaintiff in February, 2003. He agreed that she was depressed, but found only mild restrictions in Plaintiff's ability to perform the activities of daily living, maintaining social function and maintaining concentration, persistence or pace. Dr. Arocho, not a psychologist or a psychiatrist, but a generalist who is certainly qualified to spot a mental problem, told us in November, 2002 that Plaintiff's mental impairment was insignificant and then changed his mind 6 months later, but never made a referral to a mental health professional.

Dr. Perry, a clinical psychologist, evaluated Plaintiff in July, 2003. Dr. Perry found Plaintiff to suffer from major depression, but he found no deficits in the categories of understanding and memory, adaptation or concentration, persistence or pace. Dr. Perry did find Plaintiff's depression to be moderate and did find some deficits in the category of social functioning. In addition, Plaintiff was evaluated in July, 2003 by a psychiatrist, whose name we cannot read, but who agreed that Plaintiff suffered from depression and found only mild restrictions in Plaintiff's ability to maintain social functioning, maintain concentration, persistence or pace and perform activities of daily living.

The ALJ made the point that Plaintiff's treatment for mental health issues involved only the taking of medication, such as Zoloft, and that she has had no treatment by any mental health professional. Defendant made an equally valid point that Plaintiff made no reference to mental impairments when she sought reconsideration or in her testimony before the ALJ.

In summary, Plaintiff suffers from depression, but it does not significantly limit her physical or mental ability to do basic work activities. It may well affect her enjoyment of those same activities, but that is not the test. One cannot legitimately criticize the ALJ's evaluation of the evidence as it relates to the severity of Plaintiff's mental impairment.

The second error attributable to the ALJ in this case is that he failed to consider Plaintiff's

various impairments in combination. Again, we disagree. The ALJ found that Plaintiff's severe impairments include: (1) chest pain and coronary artery disease, status post bypass surgery, (2) arthritis of the neck, back, left hand and left ankle and foot, (3) osteoporosis, (4) left cubital tunnel syndrome and left carpel tunnel syndrome. The two impairments affecting Plaintiff's left hand and fingers was discovered by Dr. Raturi, a hand surgeon, in December, 2004 after a referral from Dr. Arocho, because of Plaintiff's complaint of left arm and hand pain and the tendency to drop things. Dr. Raturi performed nerve conduction tests which, confirmed an earlier diagnosis by Karla Ledoux-Coton, D.O., and discussed the possibility of corrective surgery. The surgery is often performed on an out-patient basis, is generally successful and requires a relatively short rehabilitation period.

The diagnosis of osteoporosis was first made by Dr. Fox, Plaintiff's primary care physician, in January, 1998. Dr. Fox recommended Fosamax. Dr. Hughes concurred with the diagnosis in January, 2003 as did Dr. Arocho in the period from December, 1999 to January, 2004. Osteoporosis was diagnosed after x-ray and MRI evidence and physical examinations, which showed a slight decrease in height. Dr. Patel found no evidence of lumbar disc herniation or stenosis. Dr. Hughes reported negative straight leg raising and no evidence of radiculitis. An MRI in November, 2001 showed mild to moderate foraminal stenosis at C4-5 and C6-7 and some mild foraminal narrowing at C7-T1, and in September, 2001, there was mild dessication at L3-4, L4-5 and L5-S1 and a bulge at L5-S1, results which were apparent in December, 1999, when a similar MRI was done.

The medical record, however, contains reserve functional capacity assessments from Drs. Klingle and Perez, the former of which was more restrictive than the latter. The ALJ's acceptance of an even more restrictive reserve functional capacity assessment than voiced by either physician would indicate the absence of any error in evaluating the functional deficits caused by Plaintiff's osteoporosis.

The ALJ found that Plaintiff also suffered from arthritis in her left ankle and foot, as well as in her back. The record evidence of the existence of arthritis came from Dr. Hughes in Florida. Except to the extent that Plaintiff's osteoporosis impairment affects her reserve functional capacity assessment, there are no independent restrictions dealing exclusively with arthritis. The

treatment consisted of whirlpool baths, exercise, dietary restrictions and medications. The ALJ's restriction to sedentary work with a sit/stand option was ample accommodation of Plaintiff's rather minimal arthritic problem, apparently caused or aggravated by a fall from a horse and an automobile accident 8 years thereafter.

Plaintiff's major health issue involves her heart condition, first diagnosed in 2002 by Dr. Arocho who referred her to Dr. Marques, a cardiologist. Dr. Marques noted that Plaintiff was overweight, a heavy smoker with high cholesterol and a family history of cardiac problems. She reported chest pain. After a number of tests, including cardiac enzymes and a nuclear stress test, Dr. Marques recommended a coronary artery bypass graft, which was performed in March, 2002 by Dr. Morrison. After surgery, Plaintiff was advised to quit smoking and exercise, but was only marginally compliant. Post-surgical EKG and echocardigram were normal as were cardiac enzymes. Plaintiff continued to report chest pain after surgery.

The ALJ accommodated Plaintiff's cardiac condition and reports of continuing chest pain by restricting her to sedentary work. There are several references in the record to demonstrate that the ALJ, contrary to Plaintiff's claim, did consider her impairments in combination. The restriction to sedentary work was dictated by Plaintiff's cardiac condition. The sit/stand option was dictated by Plaintiff's arthritis and osteoporosis. Since Plaintiff is right-handed, the ALJ did not believe the carpel and cubital tunnel syndrome affecting Plaintiff's left arm and hand would disqualify her from gainful work as indicated. As mentioned, the ALJ did not find Plaintiff's depression to be either severe or requiring an accommodation, but we do observe that the jobs identified by the vocational expert are not unusually stressful jobs, such as those on assembly lines or requiring quotas or mandatory production levels.

The ALJ's decision in this case is based on substantial evidence and should be affirmed.

January 23, 2008

Timothy S. Hogan
United States Magistrate Judge

17

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).